## DONOVAN v. NEW YORK CENT. R. CO. et al.

## THE KATHERINE D.

(District Court, S. D. New York. September 10, 1926.)

**1. Navigable waters** ☞20(8)—**Drawbridge owner must excuse failure to open draw promptly on request.**

The burden rests on the owner of a drawbridge to excuse his failure to open the draw promptly on request.

**2. Navigable waters** ☞20(8)—**Failure to open railroad drawbridge on signal of tug held justified by approaching train.**

Failure to open a railroad drawbridge across Harlem River on signal of an approaching tug with a tow *held* due to an approaching train and the locking of the draw by the towerman; also *held*, on conflicting evidence that the bridge tender negatived the signal from the tug.

**3. Navigable waters** ☞20(8)—**Railroad traffic on drawbridge need not be imperiled to allow immediate passage of vessels.**

The law does not require railroad traffic over a drawbridge to be imperiled, to allow the immediate passage of vessels.

**4. Towage** ☞11(7)—**Tug held in fault for collision of tow with drawbridge in failing to stop on signal of bridge tender.**

Injury to a scow in tow by collision with a drawbridge *held* due to the fault of the tug in failing to hear or heed the signal of the bridge tender that the draw would not open.

In Admiralty. Suit by Timothy J. Donovan, owner of the deck scow Katherine D,

against the New York Central Railroad Company, with the Cornell Steamboat Company, impleaded. Decree for libelant against the Steamboat Company.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (by Robert S. Erskine. and Henry P. Elliott, both of New York City), for libelant.

Alexander S. Lyman, of New York City (by Jacob Aronson, of New York City), for respondent Railroad Co.

BONDY, District Judge. The owner of the scow Katherine D brought this suit against the New York Central Railroad Company, which operates the railroad drawbridge across the Harlem River at Spuyten Duyvil, for damages arising out of the collision of the scow with the bridge. The New York Central Railroad Company impleaded the Cornell Steamboat Company, whose steamtug Frank had the Katherine D in tow at the time of the collision, when it was snowing heavily and there was a strong easterly wind blowing.

The captain of the barge Katherine D and the captain and the deckhand of the tug Frank testified that, as the Frank, with the Katherine D in tow, was coming around the bend in the Harlem River, eastward of the bridge, she blew three blasts of her whistle, and that, after she cleared the bend about 1,500 feet from the bridge, and when the bridge came into view, she repeated a three-blast signal and promptly received three blasts in reply, indicating that the bridge was open or opening, and that, as she was continuing ahead at about four miles an hour under one bell, the bridge started to open, and that when the tug was 500 feet away from the bridge, and after it was about a quarter open, it started to close again and blew a two-blast signal, too late, however, to enable the Frank to avoid the collision.

The engineer, the tender on the bridge, and the signalman in the tower about 1,500 feet north of the bridge, testified that the three-blast signal from the tug was first heard when the tug came into view, about 1,500 feet eastward of the bridge; that the bridge at once replied with two blasts, to indicate that the bridge was not opening; that the bridge was locked; that the signals were clear for a train, which was somewhere in the block south of the bridge; that the towerman did not know how fast the train was going, or when it would arrive, or anything else about it, other than that it was approaching; that the man in the tower, who controls the locking and unlocking of the bridge, signaled the bridge to remain closed; and that it did remain closed. They also testified that no three-blast signal was given from the bridge until after the train had crossed the bridge.

In making his claim against the railroad company, the libelant stated in a letter that he understood the tug signaled the bridge to open, but for some reason the bridge remained closed and allowed a train to pass before permitting the scow to pass through the draw; that the delay in opening the draw caused the collision; and that the Cornell Steamboat Company disclaims liability, because the damages were the result of the failure of the bridge tender to open the bridge after signaling his intention to do so.

The character of respondent's witnesses, the direct and positive manner in which they testified, the devices used for the safety of trains, making it impossible for the bridge tender to operate the draw until a locking device is released from the tower, from which signals are set against approaching trains, convinced me at the trial that the drawbridge was not opened and closed while the tug and scow were approaching, and that a two and not a three blast signal was given from the bridge before the collision.

Section 9964, Comp. Stat. 1913, provides among other things: "If a bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge, upon reasonable signal for the passage of boats and other water craft."

The regulations of the Secretary of War for the opening and operating of draws in the bridges crossing the Harlem River provide:

"Sec. 4. When a steam vessel wishes to pass the bridge within the time prescribed for opening the draw, the master thereof shall signify his intention by three blasts of the whistle. If the draw is ready to be opened, the signal shall be answered by three blasts of the whistle from the bridge; if the draw is not ready for opening, by two blasts from the bridge.

"Sec. 5. The draw shall be opened with the least possible delay upon receiving the prescribed signal, except when said signal is given to a railroad bridge five minutes or less before the scheduled arrival of an express passenger train. In this case the draw need not be opened until after the passage of said train unless the bridge tender

has information that the said train is delayed as much as five minutes."

[1,2] The burden rests on the owner of a drawbridge to excuse his failure to perform his duty to open the bridge promptly on request. Clement v. Metropolitan West Side Ry. Co. (C. C. A.) 123 F. 271, 274; Derby v. Staten Island Ry. Co. (D. C.) 254 F. 882; Munroe v. City of Chicago (C. C. A.) 194 F. 936, certiorari denied, 229 U. S. 609, 33 S. Ct. 464, 57 L. Ed. 1350; Great Lakes Towing Co. v. Masaba S. S. Co. (C. C. A.) 237 F. 577. I believe that the respondent met that burden. It appears that, when the towerman at Dyckman street informs the towerman at Spuyten Duyvil that a train is approaching the drawbridge from the south, the train may not proceed northerly of Dyckman street without the permission of the towerman at Spuyten Duyvil, and that when permission is given the towerman clears all signals for the block between Dyckman street and the signal 500 feet south of the bridge, and keeps the draw locked until after the train has passed the bridge. It also appears that, to open the bridge, the signals have to be thrown back and set at danger, and that this would be a hazardous thing to do while a train is in the block.

[3] The delay in opening the draw was not unreasonable. The delay was the least that was possible under the circumstances. The tug, in going ahead after it received a proper signal warning it that the bridge was not opening, took the risk of the consequences which ensued. It was not misled by the absence of signals. There is nothing in the statute or regulations which justifies a vessel which has received a warning to the contrary to proceed upon the assurance that the bridge will open at once in response to a signal, without reference to the safety of approaching trains and other surrounding circumstances. The law does not require railroad traffic over the bridge to be imperiled in order to allow the immediate passage of vessels. The Archie Crossman (D. C.) 282 F. 321.

This case is distinguishable from those in which the location of the approaching train is known, and it is also known that the bridge can be opened and the train warned in time of its opening (see P. R. R. Co. v. Central R. R. Co. of N. J. [D. C.] 59 F. 190, affirmed [C. C. A.] 59 F. 192), and from those in which a vessel having given a proper signal and carefully proceeding under slow speed has in the absence of a proper warning to the contrary the right to assume the bridge will be opened for passage (see Conklin v. Norwalk [C. C. A.] 270 F. 68, 69; Clement v. Metropolitan West Side Ry. Co. [C. C. A.] 123 F. 271; O'Keefe v. Staples Coal Co. [D. C.] 201 F. 135; Derby v. Staten Island Ry. Co. [D. C.] 254 F. 882).

[4] The proximate cause of the collision was not carelessness on the part of those on the bridge, nor unnecessary delay in opening it. The tug was at fault in approaching the bridge in such a way as not to be able to avoid the collision, when it received a two-blast signal in reply to its three-blast signal 1,500 feet from the bridge.

The libel, therefore, must be dismissed as against the New York Central Railroad Company, and sustained as against the Cornell Steamboat Company, the owner of the tug Frank, for the damages sustained by the scow Katherine D.